U.S. DISTRICT COURT
N.D. OF N.Y.
FILED

NOV 17 2004

LAWRENCE K. BAERMAN, CLERK
ALBANY

# United States District Court

_____ **NORTHERN** _____ DISTRICT OF _____ **NEW YORK** _____

In the Matter of the Search of
(Name, address or brief description of person or property to be searched)

the premises located at

1881 Central Ave.
Albany, New York
and further described in the
Affidavit and Attachment "A"

**APPLICATION AND AFFIDAVIT**
**FOR SEARCH WARRANT**

CASE NO.: 04-CR-544(TJM)

I ___ Jeffrey Montie ___ being duly sworn depose and say:

I am a(n) ___ Special Agent, Bureau of Immigration & Customs Enforcement ___ and have reason to believe that
Official Title

☐ on the person of or **x** on the property or premises known as (name, description and/or location)

1881 Central Ave., Albany, New York, as further described in the Affidavit and Attachment "A"

in the _____ Northern _____ District of _____ New York _____
there is now concealed a certain person or property, namely (describe the person or property to be seized)

The Items described in Paragraph 4 of the Affidavit

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

property that constitutes evidence of the commission of criminal offenses; and/or contraband, the fruits of crime, or things otherwise criminally possessed; and/or property designed or intended for use or which is or has been used as the means of committing criminal offenses

concerning violations of Title __ 8 __, United States Code, Section(s) 1324, et. seq., 1324a
and/or violations of Title __ 18 __, United States Code, Section(s) __ 371, 1956,1957 __

**The facts to support a finding of Probable Cause are as follows:**

### SEE ATTACHED AFFIDAVIT INCORPORATED HEREIN BY REFERENCE

**Continued on the attached sheet and made a part hereof.    x Yes    ☐ No**

_____
Signature of Affiant

**Sworn to before me, and subscribed in my presence**

November 17, 2004
Date

at    **Albany, New York**
City and State

**Hon. Randolph F. Treece**
**United States Magistrate Judge**
Name and Title of Judicial Officer

_____
Signature of Judicial Officer

AFFIDAVIT

I, Jeffrey Montie, being duly sworn, do depose and say:

1.    I am a Special Agent with the Immigration and Customs Enforcement
(ICE)Agency, U.S. Department of Homeland Security and have been so employed
since March 2003.  Prior to that, I was employed as a Special Agent, with the
former Immigration and Naturalization Service (INS), U.S. Department of Justice
for six and a half years.  During this time, I have continuously investigated
violations of the federal immigration laws, including the smuggling,
transportation, and harboring of aliens illegally in the United States.

2.    I make this affidavit in support of an application for a search warrant to search for
and seize instrumentalities, fruits, and evidence of violations of Title 8, United
States Code, Section 1324(a)(1)(A)(ii), which criminalizes, among other things,
the knowing transportation of aliens who have entered the United States
unlawfully in furtherance of that violation of law:  Section 1324(a)(1)(A)(iii),
which criminalizes, among other things, the knowing harboring of aliens who
have entered the United States unlawfully; and Sections 1324(a)(1)(A)(v)(I),
which criminalizes engaging in a conspiracy to commit: and (II), which
criminalizes aiding and abetting the commission of: the above-described acts,
1324(a)(3)(A), which criminalizes the hiring of at least 10 undocumented aliens
during one twelve month period, as well as violations of Title 18, United States
Code, Sections 371, which criminalizes conspiracies to defraud the United States
and to violate its laws, 1956, which criminalizes, among other things, money
laundering and the conspiracy to commit money laundering, and 1957, which
criminalizes engaging in monetary transactions in criminally derived property in
amounts greater than $10,000.  The items that are the subject of the search and
seizure applied for in this affidavit are more specifically described herein. This
affidavit is made in support of applications to search the following locations and
addresses, which are described in greater detail in Attachment A, as well as any
computers found at these locations and addresses:

    a.    Dragon Motel
          1881 Central Avenue
          Albany, New York

    b.    Dragon Buffet Restaurant and apartment located above the restaurant
          1881 Central Avenue
          Albany, New York

c.    Dragon Buffet Restaurant
15 Park Avenue
Shoppers World Mall
Clifton Park, New York

d.    Dragon Buffet Restaurant
1828 Altamont Avenue
Rotterdam, New York

e.    Dragon Buffet Restaurant
710 New Loudon Road
Latham, New York

f.    Dragon Buffet Restaurant
1200 Ulster Avenue
Kingston, New York

g.    Dragon Buffet Restaurant
2600 South Road - South Park Mall
Poughkeepsie, New York

h.    Residence
1309 State Street
Schenectady, New York

i.    Residence
148 Fourth Street
Troy, New York

j.    Residence
75-77 Elmendorf
Kingston, New York

k.    Residence
52 Lent St.
Poughkeepsie, New York

i.    Residence
9 Varun Lane
Lake Katrine, New York

3.    The statements contained in this affidavit are based in part on information
provided by interviews of witnesses, review of documents, discussions with

2

employees of the Immigration and Customs Enforcement Agency, Internal
Revenue Service (IRS), U.S. Department of Labor (DOL), Federal Bureau of
Investigation (FBI), New York State Police (NYSP), and numerous local police
departments, and on my experience and background as an Agent with the INS and
ICE Service. Since this affidavit is being submitted for the limited purpose of
securing search warrants, I have not included each and every fact known to me
concerning this investigation. I have set forth only the facts that I believe are
necessary to establish probable cause to believe that evidence of the above-listed
violations of the United States Code will be found at and in the above addresses,
as well as in any computers, computer systems, cash registers, or similar devices
found in these locations..

4.      The property sought to be seized from the above-listed residences and restaurants
consists of the following:

   a.      any computers, computer software, computer hard ware, computer disks,
           computer disk drives, computer monitors, computer printers, computer
           modems, tape drives, disk application programs, data disks, system disk
           operating systems, magnetic media floppy disks, zip drives, CD-ROMs,
           DVD-ROMs, hardware and software operating manuals;

   b.      business records, including but not limited to, bills, receipts, credit card
           receipts, credit card statements, bank records, bank statements, checks,
           ledgers, account statements, order forms, daily expense/revenue ledgers,
           invoices, purchase orders, and any other financial records;

   c.      cash registers, including their contents, register tapes, and any information
           recorded, stored, and otherwise contained therein;

   d.      employee records, including but not limited to, payroll records, payroll
           stubs, payroll checks, withholding records and statements, workers
           compensation records and claims, identification checks, I-9 forms, work
           permits, federal- and state-required filings, employment agency referral
           slips, employment agency documents, and any other employee-related
           records;

   e.      immigration and identification documents, including but not limited to,
           passports, visas, alien registration cards, drivers licenses, social security
           documents, credit cards, and any other records pertaining to the
           identification and status of the tenants/restaurant employees;

   f.      rental receipts, transportation receipts, laundry receipts, expense account
           ledgers, and any documents demonstrating a financial relationship between

the tenant/restaurant employees and the owners/managers/drivers of the
residences, restaurants, and vehicles.

## BACKGROUND OF CURRENT INVESTIGATION

5. Since February 2003, I and other ICE agents, as well as the IRS, FBI, NYSP, and
various local police departments, have been conducting an investigation into the
harboring and employment of illegal aliens at various Chinese restaurants,
specifically Chinese Buffet restaurants, in the area. The investigation has
expanded to include possible money laundering and other possible crimes by
individuals involved in the staffing, ownership, supply, and management of these
various Chinese Buffet restaurants.

6. Chinese Buffet restaurants typically offer a wide variety of food offerings,
including Chinese, Mexican, Mongolian and other ethnic foods, as well as
traditional American foods and assorted desserts, which are generally served at
buffet stations in unlimited quantities for a reasonable price. While the service is
buffet-style, these restaurants still rely on wait staff to handle seating, beverages
and special orders; busboys to handle the large clientele; dishwashers to handle
the necessarily rapid dishwashing; servers to dish up many of the foods served at
the buffet stations; and numerous cooks to produce the large and varied menu.
These restaurants handle a large volume of business with a fairly rapid turnover
and thus rely upon a large number of workers.

7. The investigation has indicated that these buffet restaurants rely upon illegal
aliens for staffing; that these aliens work long hours for low pay; that the aliens
are housed in homes or apartments, which are rented or owned by the restaurant
owners/managers and others; and that these aliens are transported between their
places of residence and the restaurants in vehicles owned and registered to the
restaurant owners/managers and others. The investigation has also revealed that
aliens are transported from New York City to central drop-off and pick-up
locations in the Albany and Kingston areas by various "tour" buses and
companies. Upon their arrival at these locations, the aliens are met by the
subjects and/or individuals, who have been identified as involved in running these
restaurants, and are transported to locations that have been identified as the
residences where the restaurant workers are kept.

8. The investigation has also shown that the ownership of these restaurants is often
obscured, in that state and business records often show different names, different
versions of a name, and different corporations as the owners of the restaurants.
Nonetheless, as explained in greater detail below, the investigation and other
sources have demonstrated that the Dragon Buffet Restaurants listed above are
owned by and associated with Kun Fuk "Stephen" Cheng and his wife, Jin Rong

4

"Joyce" Cheng, who was previously known as Jin Rong Guo, as well as Jin Rong Cheng's brother, Hui Guo.

| Restaurant Name/Address | Corporation | Corporate Officers* (*Based on NYS Dept. of State and/or bank records) | Business License Information |
|---|---|---|---|
| Dragon Buffet & Motel 1881 (1883) Central Avenue Albany, N.Y. | Everyday Buffet, Inc. 1881 Central Ave. Albany, N.Y. | Hui Guo - President | |
| Dragon Buffet Shoppers World Mall 15 Park Avenue Clifton Park, N.Y. | Family Buffet, Inc. 15 Park Avenue Clifton Park, N.Y. | Wai Tsit Cheng - President | |
| Dragon Buffet 1828 Altamont Ave. Rotterdam, N.Y. | Albany Buffet, Inc. 1828 Altamont Ave. Rotterdam, N.Y. | Chao Jian Lin - President | |
| Dragon Buffet 710 New Loudon Rd. Latham, N.Y. | Yes Buffet, Inc. 710 New Loudon Rd. Latham, N.Y. | Yuk Yeung Gee - President | |
| Dragon Buffet 1200 Ulster Ave. Kingston, N.Y. | Dragon Cheng Buffet, Inc. 1200 Ulster Ave. Kingston, N.Y. | Kun Fuk Cheng - President | |
| Dragon Buffet 2600 South Rd., Rte. 9 South Park Mall Poughkeepsie, N.Y. | Food King Buffet, Inc. 2600 South Rd., Rte. 9 South Park Mall Poughkeepsie | Nian Fa Lin - President | |
| | | | |

9.      In addition to the pattern of ownership of the restaurants, the investigation has determined that Kun Fuk and Cheng Jin Rong Cheng own and/or have an interest in the real estate properties that house two of the restaurants, and that Kun Fuk

5

Cheng has also used a corporate identity, Albany Realty Corp., to own property and other assets, as described more fully below.

| Property/Restaurant Address | Deed | Mortgagor/Guarantor |
|---|---|---|
| 1881 Central Ave. Albany, N.Y. Dragon Buffet Restaurant & Motel | Kun Fuk Cheng/Jin Rong Cheng | Kun Fuk Cheng Jin Rong Cheng Everyday Buffet, Inc. |
| 1828 Altamont Ave. Rotterdam, N.Y. Dragon Buffet Restaurant | Albany Realty Corp. 1881 Central Ave. Albany, N.Y. | Kun Fuk Cheng |

10.  The workers for the six Dragon Buffet Restaurants are housed in several different locations, all but one of which are owned by Kun Fuk Cheng, either in full or, in two cases, in common with Hui Guo.

| Property/Address | Deed | Mortgagor | Associated Restaurant(s) |
|---|---|---|---|
| 1881 Central Ave. Albany, N.Y. (Motel) | Kun Fuk Cheng | Kun Fuk Cheng Jin Rong Cheng Everyday Buffet, Inc. | (1) Dragon Buffet 1881 Central Ave. Albany, N.Y. (2) Dragon Buffet 15 Park Ave. Clifton Park, N.Y. |
| 1309 State St. Schenectady, N.Y. | Albany Realty Corp. 1881 Central Ave. 2nd Floor Albany, N.Y. | No mortgage filed | Dragon Buffet 1828 Altamont Ave. Rotterdam, N.Y. |
| 148 4th St. Troy, N.Y. | Hilton Lee | Unknown | Dragon Buffet 710 New Loudon Rd. Latham, N.Y. |
| 75-77 Elmendorf Dr. Kingston, N.Y. | Hui Guo/Kun Fuk Cheng P.O. Box 96 Lake Katrine, N.Y. | Kun Fuk Cheng/Hui Guo 107 Serenity Dr.* Ruby, N.Y. | Dragon Buffet 1200 Ulster Ave. Kingston, N.Y. |

| 52 Lent St. Poughkeepsie, N.Y. | Hui Guo/Kun Fuk Cheng 107 Serenity Dr.* Ruby, N.Y. | Hui Guo/Kun Fuk Cheng 21 Essex St. 10D New York, N.Y. | Dragon Buffet 2600 South Rd. Poughkeepsie, N.Y. |
|---|---|---|---|

*The investigation has determined that there is no address of 107 Serenity Dr. in Ruby, N.Y. However, Kun Fuk Cheng and Jin Rong Cheng are the owners of 88 Serenity Dr., Ruby, N.Y., which is currently for sale for $350,000. In 1994, when they purchased the property for $173,000, they listed their address as 1200 Ulster Ave., Kingston, N.Y.

Both Kun Fuk Cheng and Jin Rong Cheng are naturalized U.S. citizens. Kun Fuk Cheng, a/k/a Qinfu Zheng, entered the United States on September 20, 1981. He obtained status as a lawful permanent resident through a legalization application in which he stated that he had arrived in the United States prior to January 1, 1982. Jin Rong Cheng, in turn, obtained her adjustment in status through her first marriage to a naturalized citizen from Malaysia. This individual also appeared in connection with Kun Fuk Cheng's early INS filings, when he attested that Cheng had been his roommate in New York City during the early 1980's (which was necessary to Cheng's claim that he had lived in the U.S. prior to 1986). Jin Rong Cheng entered the United States, based on her marriage to the naturalized citizen, divorced him 15 months later, and subsequently married Kun Fuk Cheng (who at that time was reported as having entered the United States on April 27, 1988). Hui Guo entered the United States illegally (without inspection) in 1988. He was placed in deportation proceedings on August 26, 1996. Subsequently, however, he requested to adjust his status, and, as proceedings were still pending, he married a naturalized U.S. citizen from China, which has allowed him to remain in the United States as a Legal Permanent Resident.

## INVESTIGATIVE FINDINGS

11.     Based on numerous surveillances and review of financial records, the investigation has determined that:

      a.     Kun Fuk Cheng, Jin Rong Chen, and Hui Guo are knowingly hiring and employing undocumented workers at the six Dragon Buffet restaurnts;

      b.     Kun Fuk Cheng, Jin Rong Cheng, and Hui Guo are harboring illegal alien employees in houses or residences they own;

      c.     Kun Fuk Cheng, Jin Rong Cheng, and Hui Guo use relatives and others as their surrogates to manage the restaurants, transport the undocumented workers between their residences and the restaurants, and to supervise or oversee the workers in the restaurants;

      d.     Kun Fuk Cheng, Jin Rong Chen, and Hui Guo both directly and indirectly,

through their surrogates, require their undocumented employees to work long hours (11-12 hours a day, six days a week), for as little as $300 a week;

e.   Kun Fuk Cheng, Jin Rong Cheng, and Hui Guo maintain false and fraudulent employment records for their employees, do not pay employment benefits, and do not make the required tax payments on behalf of their employees;

f.   Kun Fuk Cheng and Jin Rong Cheng use "nominee" bank accounts, or bank accounts opened in the names of employees and family members, to conceal the source and true ownership of the proceeds generated from their restaurant operations, and pay business and personal expenses from these nominee accounts; the investigation has not yet determined whether Hui Guo does so, as well;

g.   Kun Fuk Cheng and Jin Rong Cheng hide their ownership of assets and property by placing their assets and properties in other names, including Hui Guo's.

h.   It appears that Hui Guo has recently assumed greater responsibility for the Kingston and Poughkeepsie restaurants, by operating and co-owning the Dragon Buffet in Poughkeepsie, supervising the employees there and in Kingston, and housing the workers for the two restaurants in properties he has purchased and co-owns with Kun Fuk Cheng (**75-77 Elmendorf, Kingston**, and **52 Lent St., Poughkeepsie**.)

## SURVEILLANCES

**1881 Central Ave., Albany**
**Dragon Buffet Restaurant and Motel**

12.   The Dragon Buffet restaurant and motel at 1881 Central Avenue, Albany are, in fact, part of a larger property, comprising the addresses of 1879-1885 Central Ave., owned by Kun Fuk Cheng. The building located at 1879 Central Ave. contains two businesses, a nail salon and a hair replacement salon, as well as four apartments, which the Chengs rent to others. The apartments, which appear to be accessible from the back of the building, include at least one upstairs apartment which is currently occupied and another upstairs apartment which is currently available for rent at $500 a month. It is not known whether the remaining two apartments are on the lower or upper floor, or whether they are occupied or not. Both the Dragon Buffet restaurant and the motel are advertised by signs; the restaurant is a large building, which appears to combine elements of Chinese and

8

American commercial business architecture.  The public restaurant area appears to

be L-shaped, with three sections or areas for eating, one of which actually appears
to be a separate, large dining room.  There are at least four food stations and a
very large area, which appears to contain the kitchen.  Above the restaurant, on
the second floor, is a very large apartment, which is believed to be the current
residence of Kun Fuk Cheng and Jin Rong Cheng.  Behind and off to the side of
the restaurant is the Dragon Buffet motel, a sprawling essentially L-shaped one
and two story building in the classic motel style, with approximately twenty
rooms. While the restaurant is listed as 1881 Central Ave., it is not clear whether
the motel shares that number address or whether it is or was listed as 1883 Central
Ave.  The address of 1885 Central Ave., which is also owned by Kun Fuk Cheng,
is, in fact, a large parking lot.

13.   On February 5, 2004, at 10:22 p.m., a Colonie Police officer conducted a traffic
stop on a large passenger van, N.Y. license plate BBK 5972, registered to Yue Ya
Hua, 20 E. Broadway #303, New York, N.Y.  The van contained 10-12 Asian
individuals.  While the officer was unable to obtain information on most of the
passengers, he was able to learn the following names and information: Jun Yun
Lin, female, unknown address, possessed an INS employment ID and is currently
seeking asylum; Nun Yi Lian, male, 410 Wilkes Barre TWP BV, Wilkes Barre,
PA, and also seeking asylum; and Yan Chang, male, 5426 North Keystone Ave.,
unknown city in Indiana, and had no information on file.  The driver, Hua, told the
officer that his passengers were employees of the Dragon Buffet, and that he was
taking them back to New York City.

14.   On February 6, 2004, at 9:30 a.m., an ICE agent conducted a surveillance of **1881
Central Ave.**  At approximately 9:40 a.m., the agent observed between six and
eight Asian individuals enter a maroon passenger van, CLW 1368, registered to
Chao Lian Lin, **15 Park Ave., Clifton Park, N.Y.**  The agent followed the van,
which drove to the Dragon Buffet restaurant at **1828 Altamont Ave., Rotterdam**,
where the passengers got out and entered the restaurant.

15.   On February 18, 2004, at 10:08 p.m., a Colonie Police Department Officer
observed the white van, BBK 5972, registered to Yue Ya Hua, pull into the
parking lot of Lee's Market, 1170 Central Avenue, and depart in the direction of
the Dragon Buffet, **1881 Central Ave.** at 10:33 p.m.  At 10:52 p.m., the same
Colonie Police Department Officer observed four vehicles parked in the lot by the
Dragon Buffet motel.  A 2004 gray Mercedes SUV, RONG 588, registered to Jin
Rong Cheng, **15 Park Ave., Clifton Park**, N.Y.  A 1998 black Nissan Pathfinder,
four door SUV, CJC 5719, registered to Jin Rong Cheng, **1881 Central Ave.**  A
1996 black Dodge passenger van, CJC 5720, registered to Cheng Dragon Buffet,
**1200 Ulster Ave., Kingston.**  A 2003 maroon Ford passenger van, CLW 1368,

9

registered to Chao Lian Lin, **15 Park Ave., Clifton Park**. At approximately 2:15 a.m., another Colonie police officer drove by **1881 Central Ave.** and observed the same four vehicles still in the parking lot.

16.      On April 15, 2004, a Colonie Police Department Officer assisted in an investigation of a civil complaint involving at the Dragon Buffet restaurant and motel at **1881 Central Ave.** As a result of the investigation, it was reported to us that, on the second floor of the motel, there was an office with a computer and several television monitors. These monitors showed security camera coverage of the restaurant, the area outside the restaurant, and an area of the motel, showing several doorways. The police officer spoke with Jin Rong Cheng, who claimed that Kun Fuk Cheng was on vacation and would be back the next day. In fact, it proved to be very difficult to locate Cheng, and took some time before he made himself available in connection with the matter.

17.      During the week of July 19, 2004, a Colonie Police Department Investigator spoke with a Confidential Informant (CI), who rents one of the four apartments at 1879 Central Ave. and pays the rent in cash to Kun Fuk Cheng. The CI stated that Kun Fuk Cheng owns the entire building. The CI further stated that the motel next to the restaurant was occupied by numerous illegal aliens, who were employed at the Dragon Buffet restaurant as waiters, waitresses, and cooks. The CI also told the Investigator that vans coming from Central Avenue frequently pull into the motel parking lot after 11:00 p.m., and drop off new workers for the restaurants.

**1828 Altamont Ave.**
**Rotterdam, N.Y.**
**Dragon Buffet Restaurant**

18.      The Dragon Buffet restaurant at **1828 Altamont Ave., Rotterdam, N.Y.** is a stand-alone building with a large parking lot, located on a corner lot on a busy street in Rotterdam. Attached to the restaurant is a small, upstairs apartment, with access by a side stairway on the outside of the building. The restaurant, which opened during the summer of 2003, is owned by Albany Realty, Inc.

19.      On February 9, 2004, at 10:01 p.m., an ICE agent observed between six and ten individuals exit from the rear of the Dragon Buffet restaurant, and get into the maroon passenger van, CLW 1368. The agent followed the van to **1309 State St., Schenectady**, where a number of the passengers got out and entered the house. The van, still under surveillance, then drove to **1881 Central Ave.**, where it parked in the rear motel area. The remaining passengers got out and entered the housing unit(s) in the area.

20.  On February 10, 2004, at 10:00 a.m., ICE surveillance observed approximately six to eight individuals leave the rear area of the motel at **1881 Central Ave.**, and get into the maroon van, CLW 1368. The van proceeded to **1309 State St., Schenectady**, where another two people got into the van. The surveillance agent followed the van, which traveled to the Dragon Buffet at **1828 Altamont Ave., Rotterdam**. The van parked at the rear of the restaurant and about eight to ten individuals got out and entered the restaurant.

21.  On August 5, 2004, at 10:25 a.m., an IRS agent observed the maroon passenger van, CLW 1368 arrive at the Dragon Buffet at **1828 Altamont Ave.** Approximately eleven passengers got out, and entered the restaurant. All but two of these individuals appeared to be Asian; the remaining two appeared to be of Hispanic origin.

22.  On August 6, 2004, the IRS agent conducted the same surveillance. At 10:18 a.m., the maroon passenger van, CLW-1368, arrived and approximately twelve passengers got out. As on the day before, all but two of these individuals appeared to be Asian; the remaining two appeared to be of Hispanic origin.

23.  On August 26, 2004, law enforcement officers took up surveillance at **1309 State St., Schenectady**. At approximately 9:50 a.m., ten individuals - eight of whom appeared to be Asian and two of whom appeared to be of Hispanic origin - came out of the house and got into the maroon passenger van, CLW 1368, registered to Jian Chao Lin, **15 Park Ave., Clifton Park**, which drove off. Approximately twenty minutes later, an IRS agent observed the maroon passenger van arrive at the Dragon Buffet restaurant, **1828 Altamont Ave., Rotterdam**, and watched the ten passengers get out of the vehicle and enter the restaurant.

**15 Park Ave.**
**Shoppers World Mall**
**Clifton Park, N.Y.**
**Dragon Buffet Restaurant**

24.  The Dragon Buffet restaurant at **15 Park Ave., Clifton Park** is the smallest of the restaurants owned and operated by the Chengs; it is essentially a takeout place with a few tables, which is located in a shopping mall. On February 10, 2004, at 10:16 a.m., surveillance agents observed a black Dodge van, CJC 5720, registered to the Cheng Dragon Buffet, Inc., **1200 Ulster Ave., Kingston, N.Y.** pull into the back parking lot of the Dragon Buffet/mall. Approximately 10 Asian individuals, nine men and one woman, got out of the van and entered through the door of the restaurant, which is marked with the number five (5).

11

25.   On August 26, 2004, at 9:30 a.m., several ICE agents, detention officers, and a NYSP Investigator initiated surveillance at **1881 Central Ave.** At 9:32 a.m., an Asian male entered the parking lot from room #109 in the motel, and a second Asian male appeared, possibly from the restaurant, and entered that room. At 9:40 a.m., a taxicab dropped off a passenger who entered the restaurant. At 9:43 a.m., several Asian individuals began gathering in the parking lot, and kept going back and forth from room 109. At 9:56 a.m., a 1996 black van, CJC 5720, registered to Dragon Cheng Buffet, Inc., **1200 Ulster Ave., Kingston, N.Y.,** loaded passengers, and pulled out of the parking lot. The van headed east on Central Ave., got on the Northway (I-87), and exited at Exit 9 (Rte. 146, Clifton Park). At 10:18 a.m., the van turned into the shopping center at **15 Park Ave.,** and the passengers got out of the van and entered the rear door of the restaurant.

**710 New Loudon Rd.**
**Latham, N.Y.**
**Dragon Buffet Restaurant**

26.   On January 21, 2004, at 9:40 p.m., a NYSP Investigator began surveillance at the Dragon Buffet at **710 New Loudon Rd.**, where the restaurant is located in a strip mall on Rte. 9, Latham, and where he observed a red van, BTX 5446, registered to the Yes Buffet, Inc., dba Dragon Buffet, **710 New Loudon Rd., Latham, N.Y.** in the parking lot. At 9:55 p.m., the van pulled out of the parking lot with thirteen passengers inside. At 10:02 p.m., the van was stopped on Rte. 2, near Old Loudon Rd., by a Colonie Police Department officer. The driver was identified as Gee Yuk Yeung, with an address of P.O. Box 481, Lake Katrine, N.Y. Yeung told the officer that he was driving the passengers to **148 4th St., Troy** and that that was where he was living, too. The officer followed the van to **148 4th St.,** Troy, and observed Yeung and all of his passengers get out of the vehicle and enter the building, which is a three-story multi-use building with a Chinese restaurant on the first floor.

27.   On January 24, 2004, at 10:47 p.m., Colonie Police Department officers were dispatched to the Hess Gas Station on Loudon Rd., based on a complaint of an annoying subject. The Hess Gas Station is located across the street from the Dragon Buffet restaurant in Latham. The subject was an Asian male, who was apparently accosting people and asking if they wished to buy his car. Just before the first officer arrived, the subject had run into the Dragon Buffet restaurant. As other officers arrived, they observed the red van, BTX 5446, which was occupied by several individuals, in the parking lot. The driver, Gee Yuk Yeung stated that the passengers were restaurant employees and were headed to their residence at **148 4th St., Troy.** ICE records show that Gee Yuk Yeung was granted voluntary departure from the U.S. on May 13, 1996; Department of Motor Vehicles records show Gee Yuk Yeung, **1200 Ulster Ave.** as the registered owner of the 2003 gray

Ford Van, CRV 6330, which has also been used to transport workers. The other three occupants of the van were all from China, and were either visa overstays or asylum applicants.

**1200 Ulster Ave.**
**Kings Mall**
**Kingston, N.Y.**
**Dragon Buffet Restaurant**

28.   The Dragon Buffet Restaurant in Kingston is located in a strip shopping mall, with the words "Dragon Cheng Buffet,"on a sign just outside of the mall. A back door in the restaurant opens onto an alley, which is accessible from the parking lot and runs parallel to the mall.

29.   On February 26, 2004, at 10:15 p.m., in the rear of the Kings Mall, a Hudson Police Department Investigator observed a green passenger van, S710MA, registered to the Dragon Cheng Buffet, **1200 Ulster Ave.,** loading fifteen passengers. At 10:18 p.m., the Investigator stopped the van, and the driver was identified as Wen-Wu Shi, 107-15 78 St., Ozone Park, N.Y. The Investigator was able to identify only two passengers; a subsequent check of Immigration records showed that neither of them was listed as in the United States legally. The van was released and the Investigator followed it. At 10:48 p.m., the van dropped its passengers off at **75/77 Elmendorf Ave., Kingston.** At 10:51 p.m., the van left and at 11:00 p.m., pulled into the driveway at **9 Varun Lane, Lake Katrine, N.Y.,** which is the residence of Hui Guo and his wife, Xiu Chai Shi.

30.   On August 17, 2004, at approximately 10:00 a.m., I and two East Greenbush Detectives conducted surveillance at the residence at **75-77 Elmendorf Ave.,** which is owned by Kun Fuk Cheng and Hui Guo. At approximately 10:10 a.m., we observed approximately ten individuals come out of the house and get into the van, # S710MA, registered to Dragon Cheng Buffet **1200 Ulster Avenue Kingston, N.Y.** The East Greenbush detectives followed the vehicle to the restaurant at **1200 Ulster Ave.,** where the van drove around and behind the building. ICE agents, who were already on surveillance at the back door of the restaurant, observed the vehicle heading towards them. Approximately eight Asian and two and Hispanic individuals got out of the van, and entered the back door of the restaurant. Some of thsee workers were wearing restaurant uniforms. The van remained parked behind the restaurant.

13

2600 South Rd.
Route 9
Poughkeepsie, N.Y.
Dragon Buffet Restaurant

31.     On August 17, 2004, an ICE agent and an IRS agent conducted surveillance at the
        Dragon Buffet restaurant at **2600 South Rd., Poughkeepsie**.  The agents entered
        the restaurant at approximately 12:00 p.m., and observed approximately 13 Asian
        individuals working in the dining room area; they could not determine how many
        people were working in the kitchen.  It appeared to the agents that the business
        was being operated by two females, one as the hostess and the other as the cashier.
        When the agents left the restaurant after eating lunch, they observed the cashier
        ring up one meal, but not the other.  The cashier placed both payments in the cash
        register, and then made a notation in a small notebook located next to the register.
        This behavior is consistent with that observed by many other agents in similar
        cases, wherein the restaurant records and reports only some of the cash receipts,
        while maintaining separate, accurate records of the actual business receipts.  The
        ICE agent asked the cashier how long the restaurant had been in operation and she
        told him that it had been almost a year.  The agent also asked whether "Steven,"
        [Kun Fuk Cheng] owned the restaurant; she said that he did, and the agent
        inquired further whether this was the same "Steven," who owned the Dragon
        Buffets in the Albany area, and she said that it was.  The agents also observed a
        box for outgoing mail, which contained mail with Hui Guo's name as the sender.
        When the agents left the restaurant, they observed a silver Ford passenger van,
        CRV 6330, which is registered to Gee Yuk Yeung, **1200 Ulster Ave., Kingston**
        in the parking lot behind the restaurant.

32.     On August 24, 2004, IRS agents conducted surveillance at the Dragon Buffet,
        **2600 South Rd., Poughkeepsie**.  At approximately 10:18 p.m., the silver van,
        CRV 6330, registered to Gee Yuk Yeung, **1200 Ulster Ave., Kingston**, left the
        plaza and traveled through Poughkeepsie.  At approximately 10:35 p.m., the van
        arrived at **52 Lent St., Poughkeepsie**, and several Asian individuals got out of the
        van and entered the residence.

33.     On September 1, 2004, at approximately 10:10 a.m., an IRS agent observed
        several Asian individuals come out of the residence at **52 Lent St.**, and get into
        the silver van, CRV 6330, registered to Gee Yuk Yeung, **1200 Ulster Ave.,
        Kingston**.  The van left the residence, and several minutes later, Special Agent
        Jay Hamilton videotaped individuals from the same van exit the vehicle and enter
        the back entrance of the Dragon Buffet located at **2600 South Rd., Rt. 9,
        Poughkeepsie, New York**.

34.     On October 28, 2004, surveillance was conducted at the Dragon Buffet restaurant at **2600 South Rd., Rte.** 9. At approximately 1:40 p.m., two ICE agents entered the restaurant for lunch, and observed about ten workers serving the food. The agents were unable to observe the workers in the kitchen. At 1:45 p.m., the agents saw Hui Guo in the restaurant. At approximately 2:00 p.m., a U.S. Department of Labor Inspector entered the restaurant and spoke with Hui Guo. Guo told the Inspector that he was the manager of the restaurant and that the restaurant was owned by Nian Fa Lin. The Labor Inspector asked if he could examine the kitchen and Guo assented. At approximately 2:10 p.m., agents outside the restaurant and parked in the alley observed 5-6 individuals come out of the restaurant and hurry to the back area of the mall. One Hispanic individual, however, jumped into a dumpster just outside the restaurant and remained there for some time. At approximately 2:35 p.m., the Labor Inspector left the restaurant. Within a few minutes the workers went into the restaurant and began bringing out heavy metal equipment, which they attempted to dispose of in the dumpsters, unsuccessfully. At approximately 3:00 p.m., Hui Guo joined the workers, spoke to them, and everyone went back into the restaurant.

## FINANCIAL RECORDS AND ANALYSIS

35.     In addition to the physical surveillances which have established that Kun Fuk Cheng, Jin Rong Cheng, and Hui Guo are harboring, transporting, and employing undocumented workers in their restaurants, as part of this investigation, an IRS agent and others have reviewed financial records that show that the Chengs and Guo have profited substantially from these violations, and that they have committed further violations of federal criminal law, by engaging in elaborate money laundering transactions with the restaurant proceeds, to conceal the ownership, sources, and control of these funds and assets.

36.     The agents' analysis of the financial records has revealed a pattern of financial activity, that is both complex and strikingly similar to patterns of financial activity in other cases involving Chinese restaurants employing undocumented workers, including the restaurants operated by Ren Ai Li and Xiao Le Li, which are the subject of a separate application and warrant. The restaurants' proceeds are typically in cash and credit charges. The credit card proceeds and some of the cash are deposited in the restaurants' corporate account(s). The bulk of the cash, however, is deposited in "nominee accounts," that is, accounts that are in other people's names, usually restaurant employees or relatives, but that are actually controlled by Kun Fuk Cheng. The apparent nominees in this case have included: Hui Guo, Jin Rong Cheng's brother and apparently the "manager," of the Kingston and Poughkeepsie restaurants, Wai Tsit Cheng, Kun Fuk Cheng's father, and at least one and probably more employees or former employees of the Chengs at the Dragon Buffet restaurants. Funds from the corporate accounts and the

15

nominee accounts, are used to purchase assets, including houses, investment accounts and vehicles, that are actually owned by Kun Fuk Cheng and his wife, but that are also listed under other names or corporations. Even the corporations, however, are listed under different names and owners than Kun Fuk Cheng or his wife. From the recent investigation of the newest Dragon Buffet restaurant in Poughkeepsie, it appears that Hui Guo has been put in charge of that restaurant and is running it, himself. This elaborate series of transactions is designed to promote the Chengs' and Hui Guo's unlawful activity by concealing and obscuring the sources, ownership, and extent of their assets and funds.

37.     The deposits into the nominee accounts consist of cash deposits in large, even amounts and "paychecks" made out to the account holders. These "paychecks" are essentially fictitious, and designed as yet another way to channel funds from the restaurants into the nominee accounts for the Chengs. The actual disbursements from the accounts have been traced back to Kun Fuk Cheng, as payments made directly to him; as payments for assets which he holds; as deposits into an asset account held by him; or as payments for expenses (such as credit card debt) associated with Cheng or his wife, Jin Rong Cheng. Cheng is not known to have any other income besides the proceeds generated by his restaurants, except for small amounts of interest and rental income; Hui Guo's only apparent income is his small salary as the restaurant manager.

38.     To date, the investigation has shown that, between January 1999 through July 2004, Kun Fuk Cheng has owned and controlled at least eight different nominee accounts at various banks. While the accounts have been opened in the names of others, in most of these cases, Cheng has appeared as having power of attorney over the accounts. During this period, more than $800,000 has passed through these accounts, with the bulk of the funds being disbursed to benefit Cheng or his family. Furthermore, none of the funds appear to be disbursed for or on behalf of the named account holders. Subpoenas for bank records are still outstanding and it is likely that these records will reveal even more payments from these and other nominees that benefit Cheng and his family.

39.     In addition to the nominee accounts set up in the names of individuals, Kun Fuk Cheng has also used a corporation, Albany Realty Corp., and corporate account to conceal his ownership and control of another $550,000 in restaurant proceeds. This account has received funds from other corporations associated with the Chengs and Guo, Everyday Buffet, Inc.; Albany Buffet, Inc., and Food King Buffet, Inc., as well as from his father, an employee or associate, and Kun Fuk Cheng's own credit card. In addition to these transfers, however, the Albany Realty account has received transfers from accounts and individuals who appear to be located in other states and who have not yet been linked to the Chengs, as well as substantial cash amounts and money orders. Transactions involving these

16

accounts typically occur only once or very infrequently twice, and appear to be linked to other Cheng transactions. Thus, for example, a transfer from the nominee account of Cheng's father, Wai Tsit Cheng, went to another individual, Yuan Lin. Yuan Lin then made a transfer of the same amount to another corporate entity, Ocean Sushi, Inc., and Ocean Sushi, Inc. then transferred the amount to Albany Realty, Corp. Funds from Albany Realty Corp. were then used to purchase **1309 State St., Schenectady, N.Y.**, which has Albany Realty Corp.'s name on the deed.

40.   As previously noted throughout the affidavit, Kun Fuk Cheng, Jin Rong Cheng, and Hui Guo appear to own at least nine different vehicles, which they have titled in their own names, other names (possibly those of employees or former employees), and in corporate names. It further appears that payments on these vehicles have been made from the various nominee accounts controlled by Kun Fuk Cheng.

41.   The nominee accounts have also been used extensively to pay for Kun Fuk Cheng's credit card expenses.

42.   Kun Fuk Cheng owns two of the properties where restaurants are located: the **1881 Central Ave.** restaurant and motel, and the **1828 Altamont Ave.** restaurant in Rotterdam. Mortgage payments to the banks, as well as payments to the preceding owner(s) have also been made from the various nominee accounts. Similarly, the residential properties owned by Kun Fuk Cheng and/or Hui Guo have been purchased from and paid for through the nominee accounts.

43.   In addition to the physical assets described above, the records indicate that Kun Fuk Cheng and Jin Rong Cheng have set up and maintained investment accounts with Charles Schwab for themselves, their children, and other family members. These accounts, too, have been funded from or through the nominee accounts.

44.   Hui Guo is the manager of the Kingston and Poughkeepsie Dragon Buffet Chinese restaurants. He is also listed as the President of Everyday Buffet, Inc., the corporate name for the Dragon Buffet located at **1881 Central Avenue** in Albany, New York. Guo is the co-owner of **75/77 Elmendorf**, a duplex located in Kingston, New York, which is used to house the illegal alien workers employed at the Dragon Buffet in Kingston, New York. Guo also owns **52 Lent Street**, a residence in Poughkeepsie, New York, that houses the illegal alien workers employed at the Dragon Buffet in Poughkeepsie, New York. Guo is the named account holder of a checking account that received more than $129,000 in deposits between August 2000 and August 2004, from a variety of sources, including several that can be linked to Kun Fuk Cheng. The withdrawals or expenditures from the account can also be traced to Kun Fuk Cheng. In addition

17

to the checking, Guo is the named account holder of a savings account that received $40,000 in deposits, which amount has been withdrawn and used to purchase assets in cash.

## INFORMATION FROM OTHER SOURCES

45.   From this investigation, my own experiences in similar cases, and conversations with many other agents. I am aware of the following general circumstances, which I believe are relevant to this case.

46.   Many undocumented aliens are part of an "invisible," or "underground" economy, finding work through family connections, references from friends, and even so-called "employment agencies." Many of the jobs available to these undocumented workers are in businesses - like restaurants - that do much of their business in cash, so that the workers can be paid in cash and kept invisible, or "off the books." For these reasons, as well as the circumstance that most aliens face cultural and language obstacles, undocumented workers - particularly those from China - commonly find work in businesses owned and operated by other people from their native country.

47.   While Chinese undocumented workers often find work in Chinese restaurants, it has recently become common for these restaurants to hire other undocumented aliens, particularly Mexicans, as well. In some cases, jobs are "advertised" in both Chinese and Spanish, and "employment agencies" have reached out to other immigrant communities.

48.   The undocumented workers' illegal status, their economic indebtedness to their relatives or to the smugglers who brought them here, and their linguistic and cultural differences make them singularly dependent upon their employers and the network of people from their native country. The employers, in turn, have a strong economic interest in keeping their employees isolated and dependent upon them. As a result, it is common for undocumented workers to be housed under the control of their employers, to be required to work long hours for illegally-low wages, and to be denied independent access to the broader social or economic culture.

49.   It is increasingly common for Chinese employers to house their undocumented Chinese and Mexican workers in residences they have rented or purchased; to place one or more individuals in charge of the residences as "enforcers," and to limit the workers' movements by transporting them from the residences to the restaurants. These "enforcers" control the undocumented workers by keeping their identification papers, uttering verbal abuse, and even using physical force, which can include sexual assaults.

50.  Typically, the residential inmates live in large numbers to a room, with no privacy and very little space for any belongings they might have. In other similar cases, I and other agents have found as many as 12 or more people sleeping on pallets or bunk beds in one room. Very often, the "landlord," who is usually the employer, charges "rent" for these accommodations and fees for any other "services," such as laundry or food. This, of course. increases the employer's profits, the employees' economic dependence upon the employer, and the isolation or invisibility of the workers.

51.  Notwithstanding the isolation of the undocumented workers, the concealment of assets (as described in the preceding section), and the veiled nature of this underground economy, my experience and that of other agents has been that restaurant owners/employers/landlords keep different sets of records. One set of records, which is for public reporting and review, documents the restaurants' receipts, based on the credit card payments and *some* of the cash received, employee expenses for a small number of employees, and any other income that may be traced to the employer through, for example, bank reporting requirements. The second set of records, which is the true accounting, records the total receipts (including *all* of the cash), the actual payroll expenses, and any other fees the employer/owner may receive. These records may be kept in written ledgers or, as is increasingly common, on computers.

52.  It has been my experience and others' that either/or both sets of records may be kept at the employer/owner's residence and/or place of business. It has also been my experience and others' that these records, as well as records relating to the employees, including their identification documents, payroll payments, and expense accounts, may also be kept at the houses where the undocumented workers are housed, under the control of the resident "enforcer," depending upon the degree of trust or the relationship between the employer and the "enforcer."

53.  It has also been my experience and others' that information relating to assets and properties owned by individuals may be kept at their residences and/or places of business. This is because, not only do the owners keep these records, but, in the cases of bank records or documents sent through the mail, these records are regularly sent in the course of business to these addresses. Based on my training and experience, I know that persons who conduct financial transactions, including persons who conduct such transactions in ways that evade reporting requirements, often keep the records of the transactions in secure locations. such as their homes, and places of business. It is also my experience that the types of records being sought are the types of records that are kept for years. In addition. based on my experience, businesses with no central business office and particularly businesses like the Dragon Buffet restaurants that conceal their true ownership and

19

associations, are as likely to maintain corporate books and records at their owners' and/or managers' residences, as at the places of business.

54.  Finally, I and other agents have observed that the increasing sophistication, even computerization, of cash registers has resulted in the storing of more information in these registers and register tapes. Furthermore, the increasing computerization of the cash registers has also enabled the operators to segregate and manipulate the information contained therein. As a result, I believe that the cash registers in the various restaurants will provide information that is relevant to this investigation.

55.  For the foregoing reasons, and based upon the evidence described throughout this affidavit, I believe there is probable cause to find that the items described in paragraph 4 above and other relevant evidence of the violations described in paragraph 2 above will be found at the locations described herein, as well as on any computers, cash registers, and related equipment found at these locations.

## SPECIFICS OF SEARCHES AND SEIZURES OF COMPUTER SYSTEMS

56.  Searches and seizures of evidence from computers commonly require agents to download or copy information from the computers and their components, or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

   a.  Computer storage devices (like hard disks, diskettes, tapes, laser disks, CD-ROMs, and DVD drives) can store the equivalent of hundreds of thousands of pages of information. Additionally, a suspect may try to conceal criminal evidence, and he might store criminal evidence in random order or with deceptive file names or deceptive file extensions. This requires searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it may be impractical to attempt this kind of data search on site.

   b.  Searching computer systems for criminal evidence is a highly technical process, requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, data search protocols are exacting

scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Because computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources and from destructive codes imbedded in the system, such as "booby traps"), a controlled environment is essential to its complete and accurate analysis.

57.   Based upon consultation with experts in computer searches, data retrieval from computers and related media, and consultations with other agents who have been involved in the search of computers and retrieval of data from computer systems, I know that searching computerized information for evidence or instrumentalities of crime commonly requires agents to seize all of a computer system's input/output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment. This is true because of the following:

a.   The peripheral devices which allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output (or "I/O") devices in order to read the data on the system. It is important the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence contained therein. In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices. If the analyst determines that the I/O devices, software, documentation, and data security devices are not necessary to retrieve and preserve the data after inspection, the government will return them within a reasonable time.

b.   In order to fully retrieve data from a computer system, the analyst also needs all magnetic storage devices as well as the central processing unit (CPU).

c.   I have been advised by computer forensic experts who have conducted computer searches that people commonly store information on their computers, without periodically cleaning out all of their computer files. I also know that even if files have been deleted, they will be sent to a recycling bin. These files can easily be restored if they are retained in the recycling bin. A user can delete the files in the recycling bin, but as

21

described below, the date is still on the computer. Even if a computer file has been deleted, the actual data in the file is not erased: only the index or directory to the file is deleted. The file remains stored on the hard drive of the computer in "slack space." ("Slack space" refers to space on a computer's hard drive that his available for use by the computer. As time passes, and space on the hard drive is needed for other functions, slack space is randomly overwritten with other data.). There is technology which would enable a computer forensic expert to retrieve files from "slack space." There is also currently software that allows an individual to delete all of the files in the computer's "slack space."

58.     The computer expert will attempt to create an electronic "image" of those parts of the computer that are likely to store the evidence described in paragraph 4. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Imaging a computer permits the agents to obtain an exact copy of the computer's stored data without actually seizing the computer hardware. The computer expert or another technical expert will then conduct an off-site search for the documents described in paragraph 4 from the "mirror image" copy at a later time. If the computer expert successfully images computers found during the execution of the warrants, the agents will not conduct any additional search or seizure of those computers.

59.     If "imaging" proves impractical, or even impossible for technical reasons, then the agents will seize those components of the computers that the computer expert believes must be seized to permit the agents to locate the documents described in paragraph 4 at an off-site location. The components will be seized and taken in to the custody of law enforcement agents. If requested by the owners of the restaurants to do so, the computer expert will, to the extent practicable, attempt to provide copies of any files not within the scope of the warrant that may be necessary or important to operate the restaurants legitimately. If, after inspecting the computers, the analyst determines that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it within a reasonable time. In addition, if the files and records described in paragraph 4, cannot be read and understood without the software or programs that created those files or records, the agents are authorized to seize such software and any documentation and manuals that describe the software and give instructions on its installation and use.

60.     The search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include the following techniques (the following is a non-exclusive list, as other search procedures may be used):

    a.      examination of all of the data contained in such computer hardware, computer software, and/or memory storage devices to view the data and determine whether that data falls within the items to be seized as set forth herein;

    b.      searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

    c.      surveying various file directories and the individual files they contain;

    d.      opening files in order to determine their contents;

    e.      scanning storage areas;

    f.      performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in paragraph 4; and/or

    g.      performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in paragraph 4.

61.    To the extent that any of the cash registers or similar equipment presents information retrieval issues like those above, I further request that the same condition and permissions be applied to any searches of these machines.

23

62.   **WHEREFORE**, I respectfully request that search warrants be issued and sealed until further order of the court authorizing me and/or any Special Agent of the Immigration and Customs Enforcement Agency, with appropriate assistance from other law enforcement authorities, to enter the premises known and described above and in the attachment, and to seize the items described herein, which constitute evidence, instrumentalities, and/or fruits of violations of Title 8, United States Code, Section 1324(a)(1)(A)(ii), Section 1324(a)(1)(A)(iii), Sections 1324(a)(1)(A)(v)(I), and (II), 1324(a)(3)(A), as well as violations of Title 18, United States Code, Sections 371, 1956, and 1957.

_____

Jeffrey Montie, Special Agent
United States Immigration and Customs
Enforcement Agency

SUBSCRIBED TO AND SWORN TO
BEFORE ME THIS 17 DAY
OF ___November___, 2004

_____
Hon. RANDOLPH F. TREECE
United States Magistrate Judge

24

## ATTACHMENT A

**1881 Central Avenue, Albany, NY**, a one-story building made out of tan block with a yellow metal roof with a white porch with columns and a railing marked by an orange neon sign "Dragon Buffet" with a second floor on part of the building as well as an outbuilding in the rear near the end of the "L" of the motel.

**15 Park Avenue, Clifton Park, NY**, a store in a Shoppers World shopping plaza located in the corner of the shopping mall with a sign, "Dragon Buffet" in red letters above it.

**1828 Altamont Avenue, Rotterdam, NY**, a two story building with a white block front, white sided back with black shutters and a orange neon sign "Dragon Buffet" on the front.

**710 New Loudon Road, Latham, NY**, a one-story white building with a red awning in the front, a brown roof, and signs on the building as well as near the road. "Dragon Buffet."

**1200 Ulster Avenue, Kingston, NY**, a store in a strip mall located in the far right corner of the strip mall next to the CVS store with a sign, "Dragon Cheng Buffet."

**2600 South Road, Route 9, Poughkeepsie, NY**, a store in a strip mall next to Blockbuster Video with wooden doors, and large red letters above the door, "Dragon Buffet."

**1309 State Street, Schenectady, NY**, a white, three-story building made of wood with a porch with four columns and a black railing, a brown front door, and the numbers "13_9" on one of the columns.

**148 4th Street, Troy, NY**, a three-story building with a Chinese restaurant on the first floor, a brick facade, and a parking lot on the left side of the building.

**75-77 Elmendorf Drive, Kingston, NY**, a two-story white house with a covered porch and two separate entrances, one marked with the numbers "75" and the other marked with the numbers, "77," a driveway on the left side, and a small garage in the rear of the house.

**52 Lent Street, Poughkeepsie, NY**, a two-story house with yellow siding containing two apartments and a chain link fence at the corner of Lent Street; large open yard in back where vehicle parked; wooden deck in the back.

**9 Varun Lane, Lake Katrine, NY**, a light colored two-story house with siding on the second story and a brick facade on the first story; a garage on the left side underneath the house; and a mailbox in front with the number, "9."

25